# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

TAVARES J. WRIGHT,

      Petitioner,

v.                                                    Case. No: 8:17-cv-974-T-02TGW

SECRETARY, DEPARTMENT OF
CORRECTIONS,

      Respondent.

_____/

## ORDER DENYING AMENDED PETITION

Tavares Wright received two death sentences for two murders during a crime spree in Polk County in 2000. He files this petition for relief from those sentences under 28 U.S.C. § 2254. The Court has before it Wright's amended petition and memorandum in support, Docs. 36, 37, and 38, the State's response, Doc. 42, and Wright's reply, Doc. 46. With the benefit of full briefing on both sides, the Court finds that a hearing is unnecessary and denies the amended petition.

## *FACTUAL BACKGROUND*

The underlying events took place over a period of several days.  The Florida Supreme Court[1] provided the factual details accurately here based upon the undersigned's reading of the trial transcript:

> With the aid of codefendant Samuel Pitts, Wright carjacked, kidnapped, robbed, and murdered David Green and James Felker while engaged in a three-day crime spree that spanned several areas in Central Florida.[2] During the crime spree, Wright was connected multiple times to a stolen pistol that matched the caliber of casings discovered at the scene of the murders. The trial court allowed the State to present evidence of these collateral acts to demonstrate the context in which the murders occurred and to explain Wright's possession of the murder weapon.
>
>> [2] Wright and Pitts were tried separately for the murders. Pitts was convicted of two counts of first-degree murder and other offenses related to this incident. He received sentences of life imprisonment for the murders.
>
> The spree began when Wright stole a pistol and a shotgun from the Shank family's residence in Lakeland on Thursday, April 20, 2000. On the Friday morning following the burglary, Wright used the pistol to commit a drive-by shooting in  a neighborhood near the Shank residence.[3] That evening, Wright and Samuel Pitts abducted Green and Felker in Lakeland, drove Green's vehicle approximately fifteen miles to Polk City, and murdered the victims in a remote  orange grove. Wright shot one victim with a shotgun, which was never recovered, and the other victim with a pistol that used the same caliber bullets as the gun stolen from the Shank residence. Wright then abandoned the victim's vehicle in a different orange grove in Auburndale. In nearby Winter Haven, Wright used the Shank pistol in a carjacking that occurred during the morning hours on Saturday, April 21, 2000. That afternoon, law enforcement responded to a Lakeland apartment

---

[1] *Wright v. State*, 19 So. 3d 277, 283–91 (Fla. 2009) (*Wright I*).

complex based on reports of a man matching Wright's description brandishing a firearm.

[3] For the drive-by shooting, Wright was convicted of attempted second-degree murder and two counts of attempted felony murder.

When an officer approached, Wright fled, but he was eventually arrested in the neighboring mobile home park. Ammunition matching the characteristics of the ammunition stolen from the Shank residence was found in his pocket. The stolen pistol was also recovered near the location where Wright was arrested. Almost a week later, the bodies of the victims were discovered. Thus, the following facts are presented in chronological order to demonstrate the geographical nexus of the offenses and to provide a complete picture of the interwoven events surrounding the double murders.

## The Crime Spree

### *The Shank Burglary: Thursday, April 20, 2000*

On Thursday, April 20, 2000, Wright unlawfully entered a Lakeland home with two accomplices. Wright testified that they separated to search the house for items to steal. In one bedroom, Wright found and handled a plastic bank filled with money. One of his accomplices discovered a 12-gauge, bolt-action Mossberg shotgun and a loaded Bryco Arms .380 semi-automatic pistol with a nine-round clip in another bedroom.[4] The accomplice also found four shells for the shotgun in a dresser drawer. In exchange for marijuana, Wright obtained possession of the pistol from the accomplice.

[4] The stolen shotgun was never recovered. References to the firearm stolen from the Shank residence relate to the automatic pistol.

When Mark Shank returned home after work to discover his firearms missing, he notified the Polk County Sheriff's Office of the burglary. The Sheriff's Office lifted latent prints from the house, including several from the plastic bank. An identification technician with the Sheriff's Office matched the latent palm print lifted from the plastic bank to Wright's palm print, confirming that Wright was inside the

house where the Shank firearms were stolen. The following day, Wright used the stolen pistol during a drive-by shooting in a nearby Lakeland neighborhood.

*The Longfellow Boulevard Drive-By Shooting: Friday, April 21, 2000*

At approximately 9 a.m. on Friday, April 21, 2000, Carlos Coney and Bennie Joiner observed a black Toyota Corolla approaching slowly on Longfellow Boulevard as they were standing outside a nearby house. Wright and Coney had been embroiled in a continuing dispute since their high school days. Joiner made eye contact with Wright, who was sitting on the passenger side. The car made a U-turn and slowly approached the house again. Wright leaned out the passenger side window and fired multiple shots. One bullet struck Coney in his right leg. Coney's neighbor carried the wounded man to a car and drove Coney and Joiner to a Lakeland hospital where a .380 caliber projectile was removed from Coney's leg.

While Coney was being treated at the hospital, crime-scene technicians collected cartridge casings and projectiles from the Longfellow Boulevard scene. Two projectiles had entered the house and lodged in the living room wall and table. One spent .25 caliber casing and three spent Winchester .380 caliber casings were recovered from the driveway and the street. The projectile recovered from Coney's leg and the one removed from the living room table were fired from the .380 pistol stolen from the Shank residence.[5] The recovered casings definitely had been *loaded* in the stolen pistol, but the firearms analyst could not state with precision that they had been *fired* from the pistol because the casings lacked the necessary identifying characteristics.

> [5] However, a .380 handgun could not have fired the .25 caliber bullet. No explanation for the different shell casing was presented at trial, though it was implied by the defense that an exchange of gunfire occurred between Wright and the victims. Coney and Joiner denied having a firearm at the Longfellow Boulevard residence.

Approximately one hour after the drive-by shooting, Wright unexpectedly visited James Hogan at a house in Lake Alfred, Florida.

4

Lake Alfred is approximately fourteen miles away from the Longfellow Boulevard location. Wright testified that he and an accomplice from the Shank burglary and Samuel Pitts traveled to see Hogan because the accomplice wanted to sell the stolen shotgun. When they arrived, the accomplice attempted to show Hogan the shotgun, but Hogan was not interested. At that point, Wright pulled a small pistol from under the floor mat in the front seat of the vehicle. This placed Wright in possession of the possible murder weapon on the day of the murders.

### The Double Murders in the Orange Grove: Friday, April 21, 2000

The trio remained with Hogan for approximately twenty minutes and then left together to return to the Providence Reserve Apartments on the north side of Lakeland. Wright and Samuel Pitts lived at that apartment complex with Pitts' family and girlfriend, Latasha Jackson. To support his theory of defense that he did not possess the pistol during the time the murders likely occurred, Wright testified that following the drive-by shooting, he informed Samuel Pitts of  the details of the shooting. Wright explained  that he had an obligation to disclose his actions to Pitts, who was the leader of a gang of which Wright was a member. According to Wright, the drive-by shooting upset Pitts, and Pitts demanded that Wright surrender the pistol. Wright asserted that he complied with Pitts' demand.

According to Wright's testimony, around twilight that Friday evening, a customer messaged Wright to inquire about procuring marijuana. Wright agreed to meet the customer at a supermarket parking lot and started walking toward the store. Shortly after 7:15 that evening, a female friend saw Wright walking down the street and offered him a ride, which Wright accepted. Then, without provocation, Wright said, "I ain't even going to lie, I did shoot the boy  in the leg yesterday," more likely than not referring to the Longfellow Boulevard drive-by shooting. When they arrived at the store, Wright exited the vehicle in the supermarket parking lot without further elaboration of the statement.

Some time that night, James Felker and his cousin, David Green, were abducted from that parking lot and murdered. The cousins left Felker's

5

house at approximately 8 p.m. in Green's white Chrysler Cirrus for a night of bowling. Both men were carrying at least $100 at that time.

Several witnesses testified that Wright had willingly described the details of the abduction. Wright had informed the witnesses that he approached Felker and Green in the supermarket parking lot and requested a cigarette. When they refused, Wright pulled out a pistol and forced his way into the backseat of Green's vehicle. Wright then ordered Green to drive to the Providence Reserve Apartments, where Pitts entered the vehicle.

As this group left the apartments between 10 and 10:45 p.m., Wright ran a stop sign in the victim's car. A detective observed the traffic infraction and conducted a tag check as he followed the vehicle. The tag check reported that the license plate was registered to an unassigned Virginia plate for a blue, 1988, two-door Mercury, which did not match the vehicle to which it was attached.

After receiving this report, the detective activated his emergency lights and attempted to stop the white Chrysler. The Chrysler sped through another stop sign and accelerated to sixty miles per hour. The detective remained in pursuit for ten to fifteen minutes before his supervisor ordered the pursuit terminated. An all-county alert was issued to law enforcement to be on the lookout for the Chrysler. The identification developed from the pursuit connected Wright to the victim's vehicle on the night of the murders.

R.R., a juvenile who also lived at the Providence Reserve Apartments, testified that Wright informed him that Wright and Pitts drove the victims ten miles from the abduction site to a remote orange grove in Polk City. When the victims insisted that they had nothing to give the assailants, Wright exited the car. One of the victims also exited, possibly by force, and Wright shot him. The other victim then exited, and Wright shot him as well. While one of the men continued to crawl and moan, Pitts retrieved the shotgun from the trunk and handed it to Wright, who then shot this victim in the head execution-style. Wright and Pitts abandoned the bodies and drove away in the Chrysler.[6]

> [6] Wright testified, to the contrary, that after he arrived at the supermarket, he conducted a drug transaction and then

6

visited other apartments in the area to sell more drugs. After making stops at various apartments, he began walking back to the Providence Reserve Apartments. While he was walking, Pitts drove up in a white vehicle. Pitts asked Wright if he wanted to drive, and as Wright walked to the driver's side, he noticed blood on the vehicle. Wright suggested that they take the vehicle to an apartment to wash it. Wright testified that it was while they were driving to the apartment that the police chase occurred.

Sometime between 10 p.m. and midnight, Pitts and Wright drove the Chrysler to a Lakeland apartment complex to wash blood spatter off the vehicle. When they arrived at the apartment, Pitts ordered Wright to wash the car while Pitts removed items from the vehicle, including a phone, a black bag, and a Polaroid camera. Pitts placed the items in his sister's vehicle. She had arrived with R.R., who testified that when they arrived, Pitts and Wright were acting nervous and scared. On the ride back to the apartment complex, Pitts told R.R. "that they pulled off a lick and that things was getting crazy."

Wright testified that before Pitts left, he ordered Wright to burn the car and throw the weapon into a lake. Instead, Wright kept the pistol and later drove back to Hogan's house in Lake Alfred. Hogan suggested that Wright dump the car in an Auburndale orange grove, and Wright followed that suggestion.

### The Winter Haven Carjacking: Saturday, April 22, 2000

In the vicinity of the Auburndale orange grove where the homicide victim's vehicle was abandoned, Ernesto Mendoza and Adam Granados were addressing a car battery problem in the parking lot of a fast-food restaurant. It was during  those early morning hours of Saturday, April 21, that Wright allegedly approached them, pointed a small handgun at a female with them, and announced that he was going to take the car.[7] Wright immediately entered Mendoza's vehicle and sped away. Granados and Mendoza quickly entered a truck and pursued Wright. The car chase continued through several streets before Wright ran the vehicle onto the curb near a car dealership in Lake Alfred.

7

Wright exited the vehicle, fired several gunshots at Granados and Mendoza, and then escaped across the car lot in the direction of James Hogan's house.

> [7] Wright refused to testify about the details of the carjacking because he was not charged with this offense.

Several .380 caliber casings were also collected from this scene. These casings were later identified as having been fired from the pistol stolen from the Shank residence. One latent print was lifted from the interior side of the driver's window of Mendoza's car, and three were lifted from the steering wheel. All of these latent prints matched Wright's known fingerprints.

Hogan, whose house was within walking distance of the car dealership from which Wright was seen fleeing, testified that when he returned home at approximately 12:30 a.m. on Saturday, he found Wright seated there. Wright asked Hogan to drive him back to the Providence Reserve Apartments, and on the way there, Wright spontaneously said "they had shot these two boys," and that he had also "got into it with some Mexicans." Wright confessed to Hogan that they had transported two white men to an orange grove and shot both men with a pistol and a shotgun. Wright also confirmed that they engaged in a high-speed chase with police in Lakeland. However, at that point, Wright did not disclose the identity of the other person who aided in the murders.

*The Providence Reserve Foot Chase and Subsequent Investigation:*
*Saturday, April 22, 2000*

After Hogan returned Wright to the apartment complex following the Winter Haven carjacking, Wright was observed throughout Saturday handling a pistol at the Providence Reserve Apartments. He also spoke with people regarding the murders. Wright confessed to R.R. that he received a cellular phone from a "lick," meaning it had been stolen. He also described to R.R. the details of the abduction and murders. Wright then gave the stolen phone to R.R.

Later that day, Wright was seated with Latasha Jackson on the steps of the apartment building, and Wright had a small firearm resting in his lap. During their conversation, Wright told Jackson that he shot two

white men in an orange grove and that he had shot one in the head. Soon after this, the police responded to a report of an armed man, who matched Wright's description, at that location.[8]

> [8] Wright was charged with aggravated assault related to this incident, but was acquitted.

A uniformed officer approached Wright and Jackson and stated that he needed to speak with Wright. Wright jumped over the balcony railing and raced down the stairs. As Wright ran from the apartment, his tennis shoes fell off. Jackson picked up the shoes and placed them by the apartment door. The police later seized these sneakers from the apartment during the murder investigation. James Felker's DNA was determined to match a blood sample secured from the left sneaker. Though Wright contended that the shoes were not his and that he had never worn them, both Wright and Pitts were required to try on the shoes. The shoes were determined to be a better fit for Wright than for Pitts.

Several officers chased Wright from the Providence Reserve Apartments to a nearby mobile home park, which was located across a field from the apartment complex. During the chase, the officers noticed Wright holding his pants pocket as if he carried something inside. Wright was arrested at the mobile home park, and his pocket contained live rounds and a box of ammunition containing both .380 Federal and Winchester caliber of rounds. This was the same caliber ammunition as that recovered from the drive-by shooting, the murders, and the carjacking.

After the police departed, a resident of that mobile home park entered her car to leave for dinner. Her vehicle had been parked there with the windows down when Wright had been arrested near her front door. As she entered her vehicle, she discovered a pistol, which was not hers. This weapon was determined to be the pistol stolen from the Shank residence.

Wright was taken into custody pending resolution of the aggravated assault charges. While Wright was in custody, Auburndale police officers discovered David Green's white Chrysler abandoned in an orange grove. Crime-scene technicians discovered blood on both the

exterior of the vehicle and on the interior left side. Four of the blood samples from the vehicle matched James Felker's DNA profile. Further investigation revealed that prints lifted from multiple locations on the vehicle matched known prints of Wright.[9]

> [9] None of the latent prints lifted from the Chrysler matched the known fingerprints of Pitts or R.R.

A deputy with the Polk County Sheriff's Office linked this abandoned vehicle with a missing persons report for David Green and James Felker. After the vehicle was discovered, the family of the victims gathered at the orange grove to search for any items that might aid in the missing persons investigations. Green had his personal Nextel cellular phone and a soft black bag filled with special computer tools that he utilized for his work in the Chrysler. A Polaroid camera had also been left in Green's vehicle. Green's fiancée discovered her son's jacket in that grove, but Green's workbag, tools, cellular phone, and camera were all missing from the vehicle.

A couple of days after the murders, Pitts attempted to sell the black bag that contained Green's computer tools to a pawnshop. R.R. assisted his stepfather in securing proceeds for the Polaroid camera from another pawnshop. The police had begun contacting pawnshops looking for the items missing from Green's car and recovered the black computer bag and the pawn tickets, which led them to Pitts and R.R.[10] Further investigation established that three latent fingerprints from the black bag matched Wright's known fingerprints.

> [10] During trial, Green's fiancée identified the Polaroid camera as the one she purchased with Green. She also identified his black workbag.

Following the information obtained from the pawnshop, the police traveled to R.R.'s residence where they identified and seized the Nextel cellular phone Wright had given R.R. The phone seized from R.R.'s residence matched the serial number of David Green's phone. R.R. told the police that Wright, who was still in jail on the aggravated assault arrest, had given him the phone.

A few hours later, a detective questioned Pitts, who revealed the general location of the bodies. Six days following the disappearance of David Green and James Felker, their bodies were discovered in a remote orange grove in Polk City. Each man had been shot three times, and spent bullet cases surrounded the bodies. David Green was face-up, with bullet wounds in his chest and in his head. From his outstretched hand, the police recovered a wallet that contained Green's license. James Felker was face-down in the same area, with three bullet wounds in his head. Green's cause of death was determined to be multiple gunshot wounds to the chest, the forehead, and the back of his neck. A medical examiner removed a projectile from Green's face and a deformed projectile from his throat. Felker's cause of death was determined to be gunshot wounds to the head, one by a .380 caliber projectile to the forehead and two by a shotgun blast to the back of the head. Except for the gunshot wound to Green's chest, any of the gunshot wounds would have rendered the victims unconscious instantaneously.

Law enforcement never recovered the shotgun used in these murders. However, a Florida Department of Law Enforcement firearms expert inspected the pistol recovered from the mobile home park, which was identified as the pistol stolen from the Shank residence, and the firearms-related evidence collected from the various crime scenes. The expended projectiles from the pistol and those found in Wright's possession were of the same caliber but were different brands. Due to the damage sustained by some of the projectiles, the expert was unable to conclusively establish that the pistol stolen from the Shank residence fired all .380 caliber bullets discovered at the scene of the murders. However, the projectiles and the firearm were of the same caliber and displayed similar class characteristics. Five Federal .380 caliber casings discovered near the victims were positively identified as having been fired from the pistol. Thus, the stolen Shank pistol had likely been used in, and connected with, the Longfellow Boulevard drive-by shooting, the double murders of David Green and James Felker, and the Winter Haven carjacking.

The underlying case history is as follows: Petitioner was charged on May 11, 2000 with carjacking, two counts of kidnapping, two counts of robbery, and two counts of first degree murder.  A2 at 341–47.[2]  The case was mis-tried twice, once for an evidentiary mishap during trial, and the second one due to a jury deadlock.  On the third trial in late 2004, the jury convicted Petitioner of all counts.  A4 at 707–15.  Petitioner waived jury at the penalty phase.  A33 at 5047–123.  On October 12, 2005 the trial court entered its sentencing order, imposing the death sentence for the two murders.  The trial court found four aggravating circumstances, three statutory mitigating circumstances, and several nonstatutory mitigating circumstances.[3]

The Florida Supreme Court affirmed on direct appeal, with the factual recitation set forth above.  *Wright I*, 19 So. 3d at 283.  Petitioner underwent a full

---

[2] The physical record, in five boxes in good order, is indexed at Doc. 43.  The trial record on appeal bears prefix "A."  The postconviction record has prefix "B."  The U.S. Supreme Court certiorari record has a "C" prefix.

[3] The four statutory aggravating circumstances were 1) previous conviction of another capital felony or felony involving violence to the person (great weight); 2) felony for pecuniary gain (no weight); 3) homicide committed in cold, calculated, and premeditated manner without any pretense of moral or legal justification (great weight); and 4) felony committed for purpose of avoiding or preventing lawful arrest (great weight). The trial court found three statutory mitigating circumstances, and gave them some weight: 1) offense committed under the influence of extreme mental or emotional disturbance; 2) Petitioner's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired; and 3) Petitioner was 19 years old at the time of the homicides.  Petitioner offered approximately 34 non-statutory mitigating circumstances and the Court found several including those related to Petitioner's low IQ, low self-esteem, emotional deprivation during his upbringing, substance abuse, neurological impairments, which affected his impulse control and reasoning ability, lack of mature coping skills, and lack of capacity to develop mature, health relationships.  *Wright I*, 19 So. 3d at 290 n.16.

round of state collateral review with no success, some of which is discussed below when it is pertinent to one or more grounds for relief.  Petitioner now brings this amended petition for federal habeas relief under 28 U.S.C. § 2254, Doc. 36, and memorandum in support.  Doc. 38.  The State has filed a response, Doc. 42, to which Petitioner replied.  Doc. 46.

The standards by which this petition is adjudged are set forth as follows: Because it was filed after April 24, 1996, this case is governed by the Antiterrorism and Effective Death Penalty Act of 1996, 28 U.S.C. § 2254 ("AEDPA").  *Lindh v. Murphy*, 521 U.S. 320, 336 (1997); *see also Woodford v. Garceau*, 538 U.S. 202, 210 (2003).

Under the AEDPA, a writ of habeas corpus cannot be granted unless the petitioner has exhausted all available state court remedies.  28 U.S.C. § 2254(b)(1); *see also Coleman v. Thompson*, 501 U.S. 722, 731 (1991); *Rose v. Lundy*, 455 U.S. 509, 510 (1982).  To exhaust state remedies, the petitioner must "fairly present" his claims to the state's highest court in a procedurally appropriate manner. *O'Sullivan v. Boerckel*, 526 U.S. 838, 848 (1999).  A claim is "fairly presented" if the petitioner has described the operative facts and the federal legal theory on which his claim is based so that the state courts have a fair opportunity to apply controlling legal principles to the facts bearing upon his constitutional claim. *Anderson v. Harless*, 459 U.S. 4, 6 (1982); *Picard v. Connor*, 404 U.S. 270, 275–

13

78 (1971).  Unless the petitioner clearly alerts the state court that he is alleging a specific federal constitutional violation, he has not fairly presented the claim.  A petitioner must make the federal basis of a claim explicit either by citing specific provisions of federal law or federal case law, or by citing state cases that explicitly analyze the same federal constitutional claim.  *Howell v. Mississippi*, 543 U.S. 440, 443–44 (2005).

A habeas petitioner's claims may be precluded from federal review in two ways.  First, a claim may be procedurally defaulted in federal court if it was actually raised in state court but found by that court to be defaulted on state procedural grounds.  *Coleman*, 501 U.S. at 729–30.  Second, a claim may be procedurally defaulted if the petitioner failed to present it in state court and "the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred." *Id.* at 735 n.1.

The AEDPA established a "substantially higher threshold for habeas relief" with the "acknowledged purpose of 'reducing delays in the execution of state and federal criminal sentences.'" *Schriro v. Landrigan*, 550 U.S. 465, 475 (2007) (quoting *Woodford v. Garceau*, 538 U.S. 202, 206 (2003)).  The AEDPA's "'highly deferential standard for evaluating state-court rulings,' demands that state-court decisions be given the benefit of the doubt." *Woodford v. Visciotti*, 537 U.S.

14

19, 24 (2002) (per curiam) (quoting *Lindh v. Murphy*, 521 U.S. 320, 333 n.7 (1997)).

Under the AEDPA, a petitioner is not entitled to habeas relief on any claim "adjudicated on the merits" by the state court unless that adjudication: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d).  The relevant state court decision is the last reasoned state decision regarding a claim.  *Kernan v. Hinojosa*, 136 S. Ct. 1603, 1605–06 (2016) (citing *Ylst v. Nunnemaker*, 501 U.S. 797, 803–04 (1991)).

"The threshold question under the AEDPA is whether [a petitioner] seeks to apply a rule of law that was clearly established at the time his state-court conviction became final."  *Williams v. Taylor*, 529 U.S. 362, 390 (2000). Therefore, to assess a claim under subsection (d)(1), the Court must first identify the "clearly established Federal law," if any, that governs the sufficiency of the claims on habeas review.  "Clearly established" federal law consists of the holdings of the Supreme Court at the time the petitioner's state court conviction became final.  *Williams*, 529 U.S. at 412; *see Carey v. Musladin*, 549 U.S. 70, 74 (2006).

The Supreme Court has provided guidance in applying each prong of §
2254(d)(1).  The Court has explained that a state court decision is "contrary to" the
Supreme Court's clearly established precedents if the decision applies a rule that
contradicts the governing law set forth in those precedents, thereby reaching a
conclusion opposite to that reached by the Supreme Court on a matter of law, or if
it confronts a set of facts that is materially indistinguishable from a decision of the
Supreme Court but reaches a different result.  *Williams*, 529 U.S. at 405–06; *see
Early v. Packer*, 537 U.S. 3, 8 (2002) (per curiam).  In characterizing the claims
subject to analysis under the "contrary to" prong, the Court has observed that "a
run-of-the-mill state-court decision applying the correct legal rule from [the
Supreme Court's] cases to the facts of the prisoner's case would not fit
comfortably within § 2254(d)(1)'s 'contrary to' clause." *Williams*, 529 U.S. at
406.

Under the "unreasonable application" prong of § 2254(d)(1), a federal
habeas court may grant relief where a state court "identifies the correct governing
legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts
of the particular . . . case" or "unreasonably extends a legal principle from
[Supreme Court] precedent to a new context where it should not apply or
unreasonably refuses to extend that principle to a new context where it should
apply." *Williams*, 529 U.S. at 407.  For a federal court to find a state court's

16

application of Supreme Court precedent "unreasonable" under § 2254(d)(1), the petitioner must show that the state court's decision was not merely incorrect or erroneous, but "objectively unreasonable."  *Id.* at 409; *Visciotti*, 537 U.S. at 25.

Under the standard set forth in § 2254(d)(2), habeas relief is available only if the state court decision was based upon an unreasonable determination of the facts. *Miller–El v. Dretke*, 545 U.S. 231, 240 (2005) (*Miller–El II*). A state court decision "based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding[.]"  *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003) (*Miller–El I*).  In considering a challenge under 2254(d)(2), state court factual determinations are presumed to be correct, and a petitioner bears the "burden of rebutting this presumption by clear and convincing evidence."  28 U.S.C. § 2254(e)(1); *Miller–El II,* 545 U.S. at 240.  However, only the state court's factual findings, not its ultimate decision, are subject to 2254(e)(1)'s presumption of correctness.  *Miller–El I*, 537 U.S. at 341–42 ("The clear and convincing evidence standard is found in § 2254(e)(1), but that subsection pertains only to state-court determinations of factual issues, rather than decisions.").

## PETITIONER'S GROUNDS ONE, TWO, AND THREE

These three grounds comprise the bulk of the petition.  They address Petitioner's mental status and claimed intellectual disability.  They are related, and

the Court combines them here for discussion.  Ground I, which spans 82 pages of the 160-page petition, seeks relief because Petitioner is intellectually disabled and thus may be not be put to death under the eighth amendment to the U.S. Constitution.[4]  Ground II seeks relief because Florida Statutes § 921.137(4),[5] which requires a defendant in the death phase to establish intellectual disability by clear and convincing evidence, imposes a standard of proof upon a defendant that violates the defendant's due process rights under the fifth, sixth, eighth and fourteen amendments.[6]

---

[4] To quote the petition: "Ground One: Wright is intellectually disabled, and his execution is barred by the eighth amendment of the United States Constitution.  The state court's resolution of Wright's claim was an unreasonable application of clearly established federal law, including *Atkins v. Florida*, 536 U.S. 304, *Hall v. Florida*, 134 S. Ct. 1986 (2014), and *Moore v. Texas*, 137 S. Ct. 1039 (2017).  Further, the state court made an unreasonable determination of the facts in light of the state court record." Doc. 36 at 9.

[5] This statute, entitled "Imposition of the death sentence upon an intellectually disabled defendant prohibited" states in pertinent part: "After a defendant who has given notice of his or her intention to raise intellectual disability as a bar to the death sentence is convicted of a capital felony . . . the defendant may file a motion to determine whether the defendant is intellectually disabled.  Upon receipt of the motion, the court shall appoint two experts in the field of intellectual disabilities who shall evaluate the defendant and report their findings to the court . . . . At the final sentencing hearing, the court shall consider the findings of the court-appointed experts and consider the findings of any other expert which is offered by the state or the defense on the issue of whether the defendant has an intellectual disability.  If the court finds, by clear and convincing evidence, that the defendant has an intellectual disability . . . the court may not impose a sentence of death and shall enter a written order that sets forth with specificity the findings in support of the determination."

[6] To quote the petition: "Ground Two: Fla. Stat. § 921.137(4) is unconstitutional and violates Wright's due process rights as protected by the fifth, sixth, eighth, and fourteen amendments to the United States Constitution.  The state court's resolution of Wright's claim was an unreasonable application of clearly established federal law.  Further, in many respects, the state court made an unreasonable determination of facts in light of the state court record."  Doc. 36 at 91.

Ground III also addresses mental disability.  It alleges that trial counsel provided ineffective assistance of counsel by failing adequately to present mitigation evidence (related to mental disability) at the penalty phase.[7]

**Procedural Background of these Claims:** After conviction below, Petitioner waived the jury recommendation in the penalty phase, and the jury was discharged.  During the penalty hearing, Petitioner filed a motion to bar the death penalty due to intellectual disability ("ID"), then known under the term "mental retardation."  A5 at 743–44.  The trial court conducted a lengthy penalty phase hearing, receiving several mental health expert witnesses, including two retained by Petitioner and two that the Court appointed.  The Court found Petitioner was not intellectually disabled, primarily due to his tested IQ of 75, 77, and 82.[8]  The Court did not consider adaptive functioning specifically at this penalty phase.  A5 at 829. Petitioner did not bring this point on direct appeal.  *Wright I.*

In his postconviction proceedings, Petitioner received a first hearing, in October 2012 lasting several days, on his collateral ID claims and other trial-

---

[7] To quote the petition: "Ground Three: Wright received prejudicial ineffective assistance of counsel at the penalty phase of his trial when trial counsel failed to adequately investigate, prepare and present available mitigation.  The state court's resolution of Wright's claim was an unreasonable application of clearly established law, including *Strickland v. Washington*, 366 U.S. 668 (1984), *Wiggins v. Smith,* 539 U.S. 510 (2003), *Williams v. Taylor*, 529 U.S. 362 (2000), *Porter v. McCollum*, 558 U.S. 30 (2009), *Sears v. Upton,* 130 S. Ct. 3259 (2010), and *Rompilla v. Beard*, 545 U.S. 374 (2005).  Further, in many respects, the state court made an unreasonable determination of facts in light of the state court record."  Doc. 36 at 93.
[8] A5 at 755, 789, 791.

related claims.  He called multiple witnesses.  The state circuit court ruled against Petitioner after this hearing, in a lengthy order.  Doc. 37 at 26–116.  But during the pendency of Petitioner's appeal from this ruling, the U.S. Supreme Court issued its opinion in *Hall v. Florida,* in which it held Florida's intellectual disability scheme unconstitutional insofar as it equated adaptive functioning to a strict IQ score requirement.  572 U.S. 701, 704–05 (2014).  Thereafter, the Florida Supreme Court relinquished jurisdiction of Petitioner's appeal and allowed him to file a renewed motion for determination of ID with the postconviction court.

After Petitioner refiled his postconviction ID motion post-*Hall*, the postconviction court granted a renewed evidentiary hearing on ID, where the court heard from additional witnesses, including more mental health experts.  Doc. 37 at 118–29.  The state circuit court denied Petitioner's renewed motion in 2015, *id.*, and Petitioner appealed.

The result of the appeal was a detailed opinion, *Wright II*, in which the Florida Supreme Court undertook a very detailed examination of the record on Petitioner's ID claims, and stated: "Given that Wright has not even demonstrated by a preponderance of the evidence either of the first two prongs for a determination of intellectual disability, we conclude that he has not demonstrated that he belongs to that category of individuals that are categorically ineligible for

20

execution." *Wright v. State*, 213 So. 3d 881, 902 (Fla. 2017) (*Wright II*), *cert. granted*, *vacated and remanded*, 138 S. Ct. 360 (2017).

Two weeks after the Florida Supreme Court issued *Wright II*, the U.S. Supreme Court issued an opinion out of Texas on capital punishment intellectual disability issues, *Moore v. Texas*, 137 S. Ct. 1039 (2017). *Moore* was issued in spring 2017. Petitioner filed a certiorari petition from *Wright II* that the Supreme Court first addressed upon returning from their 2017 summer recess. That Court granted, vacated, and remanded ("GVR") *Wright II* in light of *Moore*. *Wright II* thus came back on remand to the Florida Supreme Court in late 2017 without opinion for reconsideration in light of *Moore*. *Wright v. Florida*, 138 S. Ct. 360 (2017). The Florida Supreme Court then issued *Wright III*. *Wright v. State*, 256 So. 3d 766 (Fla. 2018) (*Wright III*).

In *Wright III* the Florida Supreme Court first discussed, correctly, that the "GVR" remand after *Moore* was not a merits determination nor precedential. 256 So. 3d at 769. The *Wright III* court set forth to "reconsider this case in light of *Moore* to determine if a different outcome is warranted." *Id.* at 770. It again reviewed the two main elements of ID, quantitative intelligence (basically, IQ) and adaptive functioning, to determine if the *Moore* opinion changed matters. Upon its detailed review of the evidence and consideration of *Moore*, the Florida Supreme Court held:

21

> At the ID hearing, the parties presented all the evidence that they could muster, which resulted in an outcome adverse to Wright. Because that decision was supported by competent, substantial evidence, which we thoroughly detailed, [in *Wright II*], we can again conclude that Wright failed to prove adaptive deficits by clear and convincing evidence—a conclusion that *Moore* did not alter.

*Wright III*, 256 So. 3d 778.

The Florida Supreme Court in *Wright III* thus reaffirmed denial of

Petitioner's ID petition.  Petitioner's certiorari petition on *Wright III* was denied in

June 2019, *Wright v. Florida*, 139 S. Ct. 2671 (2019), and he filed the instant

amended federal habeas petition shortly thereafter.  The petition is timely.

The summary of events is as follows:

April 20–22, 2000: 3-day crime spree and murders
October 18, 2004: the instant (third) trial starts
November 13, 2004: jury guilty verdicts
May 10–11, 2005: penalty phase bench trial
September 22, 2005: penalty phase ID bench hearing
October 12, 2005: sentencing order, death sentence entered
September 3, 2009: direct appeal (*Wright I*) aff'd by Fla. Sup. Ct.
November 5, 2010: state postconviction petition filed
March 9, 2012: amended state postconviction petition filed
October 16–18, 2012: trial court hearing on postconviction claims
May 22, 2013: trial court denies postconviction claims, appealed
May 27, 2014: U.S. Sup. Ct. issues *Florida v. Hall*
October 7, 2014: Fla. Sup. Ct. relinquishes pending appeal to trial court for reconsideration in light of *Florida v. Hall*
January 5–6 & February 11, 2015: 3 days of hearings on post-*Hall* ID motion
March 26, 2015: trial court denies post-*Hall* ID motion, appealed
March 16, 2017: postconviction appeal aff'd by Fla. Sup. Ct., revising an earlier 2016 affirmance (*Wright II*)
October 16, 2017: on cert. petition, U.S Sup. Ct. grants GVR of *Wright II* in light of new case *Moore v. Texas*

22

Sept. 27, 2018: Fla. Sup. Ct. affirms postconviction denial (*Wright III)*
June 3, 2019: U.S. Sup. Ct. denies cert. on *Wright III*

**The Legal Test for The Intellectual Disability Defense:** In *Atkins v. Virginia*, the Supreme Court held that the eighth amendment to the U.S. Constitution "restrict[s] . . . the State's power to take the life of" an intellectually disabled individual. 536 U.S. 304, 321 (2002). Adjudications of intellectual disability should be 'informed by the views of medical experts." *Hall v. Florida*, 572 U.S. at 721. The "generally accepted" approach, according to the *Moore* Court, is to consider 1) intellectual functioning deficits, indicated by an IQ score roughly two standard deviations below the mean, 2) adaptive deficits, which are the inability to learn basic skills and adjust behavior to changing circumstances, and 3) require onsets of these deficits while still a minor. *Moore*, 137 S. Ct. at 1045; *see also Atkins*, 536 U.S. at 308 n.3.

**The Florida Courts Reasonably Held Petitioner is Not Mentally Disabled:**

*Trial Evidence Shows No Mental Disability*

Before delving into what the Florida courts did to adjudicate Petitioner's intellectual disability claim in the penalty and postconviction phases, it is worthwhile to simply state, in lay terms, what the trial record shows about Petitioner's mind. The record shows this: Tavares Wright is not intellectually disabled. Tavares Wright is not, in the former term, mentally retarded.

23

The one portion of this record in which Petitioner could neither malinger about nor script, and had to show his full wits, was in his trial direct examination and more importantly in his cross examination.  The trial record shows that Petitioner ably and clearly testified in his defense.  A30 at 4517–626.  He was coherent.  He was clear.  On both direct and cross he understood the questions and his answers were responsive, concise, and lucid.  He underwent a thorough cross examination.  He responded politely and firmly, and held up well.  He portrayed an entire and complete version of facts, chronologically, that exculpated him on the murders and placed blame on the separately-tried codefendant Mr. Pitts.  A30 at 4567–622.  Petitioner did not stray or deviate from the defense theme and clear factual version that mapped the path to acquittal.

Petitioner was firm and rational in refusing to testify about the second, uncharged Mendoza/Winter Haven carjacking for which he could have faced future criminal exposure.  He identified every question that touched on this uncharged criminal exposure, and he declined to answer them, correctly noting why.  A30 at 4576–79.  He effectively parried the prosecutor's questions.  *See, e.g.*, A30 at 4576, 4606.  His trial testimony addressed unimpeachable points of the State's case.  For example, he noted that he leaned against the victim's car when Pitts drove it up, which addressed any fingerprints thereon.  A30 at 4547.  He had a plausible and firmly stated reason why bullets that matched the murder weapon

24

were in his pocket at his arrest.  A30 at 4611 (Pitts bought them and later asked Petitioner to discard along with the gun).  He ably and consistently set up a factual scenario, without logical holes or gaps, whereby Mr. Pitts disappeared alone, and returned somewhat later driving the victims' blood-marked car.  No one can read Petitioner's direct and cross examination and rightly say this man is so bereft of mind that the eighth amendment bars this punishment.[9]

In addition to his capable trial testimony other concrete facts in this record show Petitioner's mental ability. He earned his GED while in juvenile boot camp. A39 at 367.[10]  He did not have a driver's license because he could not pass the written test, but he was a capable driver, at one point outrunning the police after a chase, and later driving the dead victims' car away to abandon it.  A30 at 4547, 4554, 4556, 4563–64; B24 at 1304.  He managed his marijuana sales business, receiving pages from regular customers, and traveling to call on customers and doling out bags of marijuana and collecting money.  A30 at 4521, 4539–41, 4544. He exchanged marijuana for the pistol used in the murders.  *Id.* at 4520.

---

[9] The Florida Supreme Court stated that "Wright gave extensive testimony during trial, where he told a coherent narrative of his version of events.  He testified at length and was not generally aided by leading questions.  Furthermore, he endured a strong cross-examination by the State…." *Wright II*, 213 So. 3d at 900.  The state circuit judge who issued the postconviction order found Petitioner's trial testimony was "very telling and compelling in gauging the Defendant's intellectual functioning and adaptive behavior."  Doc. 37 at 123.

[10] A defense expert testified this was not a real high school graduate equivalency degree, but was a certificate which evidenced something much less.  Doc. 36 at 106–07.

He not infrequently criticized his lawyer's work and strategy, questioning and suggesting alternate steps.  B21 at 733; *accord Wright II*, 213 So. 3d at 900–01 ("Wright assessed the performance of his counsel across all three of his trials, sometimes expressing dissatisfaction with their inability to elicit certain evidence that had been elicited during a previous trial.").  He argued to the state trial court that his defense lawyers should have prior transcripts on hand to impeach witnesses. A22 at 2969.  He lucidly addressed the court about his worry concerning trial fairness and engaged in other lucid colloquy with the judge.  A4 at 669–75; A20 at 2581–88.  He articulately waived a jury finding on the record, in the penalty phase, A33 at 5083–92.  At that time his lawyer said Petitioner is "articulate, bright, aware of what's going on in his reasoning."  He said, "I understood everything."  A33 at 5092–93.

Family relatives testified that Petitioner reads the Bible often in prison, writes letters and cards, and asked for a college-level dictionary.  A38 at 293–94.  They testified that he learned to work in a fast-paced shelving job at a grocery store, did not have problems understanding them, and knew how to use the city bus system.  *Wright III*, 256 So. 3d at 778.  In police interviews he recalled addresses and phone numbers of others.  B25 at 1475.  The Florida Supreme Court noted "[t]he interview is inconsistent with an intellectually disabled defendant." *Wright II*, 213 So. 3d at 901.

26

*Florida Court Used Appropriate Procedures and Made Reasonable Findings*

Florida statute § 921.137(2) states that "[a] sentence of death may not be imposed upon a defendant convicted of a capital felony if it is determined in accordance with this section that the defendant is intellectually disabled."  Section 921.137(1) further states:

> As used in this section, the term "intellectually disabled" or "intellectual disability" means significantly subaverage general intellectual functioning existing concurrently with deficits in adaptive behavior and manifested during the period from conception to age 18. The term "significantly subaverage general intellectual functioning," for the purpose of this section, means performance that is two or more standard deviations from the mean score on a standardized intelligence test specified in the rules of the Agency for Persons with Disabilities. The term "adaptive behavior," for the purpose of this definition, means the effectiveness or degree with which an individual meets the standards of personal independence and social responsibility expected of his or her age, cultural group, and community. . . .

The conclusions of the Florida courts that Petitioner did not meet the definition of intellectually disabled under this definition are sound, and reasonable. The state circuit court and Florida Supreme Court followed *Atkins*, *Hall*, *and Moore*, *supra*.

Concerning the element of "general intellectual functioning," a rough, general inquiry is whether the Petitioner exhibited IQ scores below 70, which is two standard deviations below the mean.  One must take into account the standard error of measurement ("SEM") with these tests.  Taking the SEM into account, ranges in the 70 to 75 level still require consideration of adaptive functioning, and

27

a Petitioner even with a 75 IQ could prove intellectual disability by showing

substantial adaptive deficits.  *Hall*, 572 U.S. at 722 (quoting *Atkins*, 536 U.S. at

309 n.5).

The IQ scores present in this record are generally higher than those recently

reviewed by the Eleventh Circuit in a capital case affirming denial of relief.  *See*

*Clemons v. Comm'r, Ala. Dept. Corr.*, __ F.3d __, 2020 WL 4370963, at *13 (11th

Cir. July 30, 2020) (Clemons' IQ scores were 51, 58 adjusted to 66, 67 adjusted to

60, 73, 77, 84).

Both the state circuit court[11] and Florida Supreme Court noted that Petitioner

has taken a total of nine IQ tests, all of them reported full-scale scores of 75 or

above.  His highest was a full-scale score of 82.  As to this 82, Petitioner's own

expert testified it was "valid and free of any practice effect concerns."  *Wright II*,

213 So. 3d at 897.  These tests started at age ten.  On the IQ testing element alone,

Petitioner clearly is not disabled.[12]  Even if one factored in the SEM, and

hypothetically said every test taken was too high by the maximum SEM rate,

Petitioner is still over 70 on each of them save two, as he scored 75 on two of

---

[11] The postconviction trial court's detailed 2013 order can be found at Doc. 37 at 26.  The same court's order, after remand due to *Hall* can be found at Doc. 37 at 118.  Both orders show a very detailed, fact-based postconviction inquiry with several dozen witnesses.  The postconviction court heard testimony, all told, from at least seven mental health experts.

[12] Petitioner scored a 76, 80, and 81 on his first three IQ tests at age 10 or 11.  Doc. 36 at 89, 102. He scored 75 on his next test at age 16.  *Id.*  He took two abbreviated tests in 2001 and 2004.  He took two full tests in 2005, scoring 82 and 75, respectively.  Doc. 36 at 15, 103.

them.  The data simply shows, no matter how it is viewed, tests almost universally over 70 and some over 80.  Summarizing all the IQ test evidence accurately, the *Wright II* court held: "Wright has not proven even by a preponderance of the evidence, and certainly not by clear and convincing evidence, that he is of subaverage intellectual functioning."  213 So. 3d at 896–98.  These various IQ tests, by various practitioners spanning over a decade, are in the record; all of them augur against Petitioner on the first "general intellectual functioning" element of mental disability.  *Id.*  The Florida Supreme Court reaffirmed this proper finding after the *Moore* remand, in *Wright III*.  256 So. 3d at 771–72.  The *Wright III* court held: "Based on the competing medical testimony of Dr. Kasper and Dr. Gamache—along with numerous IQ test scores above 70 after SEM adjustments—there was competent, substantial evidence for the postconviction court to conclude that Wright failed to prove significant subaverage intellectual functioning by clear and convincing evidence."  256 So. 3d at 771–72.

The record that Petitioner suffers no qualifying ID is strengthened by the indication in this record that Petitioner may have been malingering in some tests. The State expert expressed these concerns and the Florida Supreme Court was reasonable in considering the likelihood of malingering when reviewing this record.  *Wright II*, 213 So. 3d at 898.  In *Clemons*, *supra*, the Court noted that "it is abundantly clear that a state court may discount IQ scores where there is evidence

29

of malingering."  2020 WL 4370963, at *13 (citing *Carroll v. Sec'y DOC*, 574 F.3d 1354, 1359, 1367–68 (11th Cir. 2009)).

Additionally, the Florida courts properly considered the second ID element of "adaptive functioning," consistent with prevailing U.S. Supreme Court pronouncements.  The Florida Supreme Court consulted and followed modern medical advice, citing to the authoritative AAIDD-11 and DSM-5 definitions of adaptive functioning and discussing how those authorities impacted Petitioner's case.[13]  *Wright III*, 256 So. 3d at 773.  The state courts properly found Petitioner had not proven adaptive functioning deficits.  Considering the multiple mental health experts who examined Petitioner at length and testified on this topic at length in the hearings on mental disability, the lay witnesses, the crimes at bar and the trial testimony, the *Wright II* court found "all of these types of evidence refute that Wright has concurrent deficits in adaptive functioning."  213 So. 3d at 898–99. The Florida Supreme Court provided a detailed, multi-page summary in this regard, *id.* at 898–902, which is well based in the evidentiary record.  The Florida Supreme Court then readdressed the findings at length, including a full discussion of the AAIDD-11 and DSM-5 standards in *Wright III*.  256 So. 3d at 773–78.  This

---

[13] These sources are DSM-5, i.e. American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 37 (5th ed. 2013) and AAIDD-11, American Association of Intellectual Development Disabilities, *Intellectual Disability: Definition, Classification, and Systems of Supports* 5 (11th ed. 2010).  *See Wright III*, 256 So. 3d at 771–76.

discussion closely followed *Hall* and *Moore.* It is noteworthy that even Petitioner's expert agreed that Petitioner did not have current deficits in the social and practical skills domains. *Wright III*, 256 So. 3d at 777; *Wright II*, 213 So. 3d at 900. The only adaptive deficit that Petitioner's expert Dr. Kasper could point to is in the subcategory of conceptual skills.

In crediting the State's expert, both the trial court and the Florida Supreme Court exercised reasonable judgment based upon the extensive record, consistent with federal constitutional principles. As noted above, the only adaptive function in dispute was in regard to conceptual skills. And:

> To a large extent, [the State expert's] findings with regard to conceptual skills related to Wright's ability to read and write, understand numbers and time, comprehend his current legal circumstances, and conduct monetary transactions prior to incarceration. [citation omitted] These findings all directly impact and are connected with adaptive functioning within the conceptual domain. *See* DSM-5, at 37 (identifying "memory, language, reading, writing, math reasoning, acquisition of practical knowledge, problem solving, and judgment in novel situations" as hallmarks of the conceptual domains).

*Wright III*, 256 So. 3d at 777 (citing *Moore*, 137 S. Ct. at 1045–47).

Under the standard set forth in §2254(d)(2), habeas relief is available only if the state decision was based upon an unreasonable determination of the facts. *Miller-El II*, 545 U.S. at 240. This determination that Petitioner was not suffering from ID is well founded. Thus Ground One is denied.

In Ground Two, Petitioner asserts that the Florida statute is unconstitutional and violates his right to due process because it places upon him the burden to prove intellectual disability by clear and convincing evidence. This ground is due to be dismissed and denied for three reasons.

First, as the Respondent notes, this is ground is unexhausted, and therefore procedurally barred, subject to dismissal. This ground was not squarely presented to the Florida courts in a manner to get a proper merits ruling. Petitioner raised this point for the first time in his written closing arguments to the state circuit court, submitted after his final intellectual disability hearing. At the outset of the hearing Petitioner's counsel had acknowledged that this was the applicable standard. B20 at 628–29. The claim that this standard and burden of proof was unconstitutional did not arise until written closing arguments, where Petitioner argued in favor of a preponderance standard. B26 at 1715–17. Raising the issue for first time in a written closing argument does not preserve it under Florida well-established pleading requirements, as the *Wright II* court noted. 213 So. 3d at 896 n.3. The federal issue was thus not squarely presented for state court review, and the point was denied on an adequate and independent state law ground as unpreserved under Florida procedural rules. "It is a 'fundamental principle that state courts are the final arbiters of state law, and federal habeas courts should not second-guess them on such matters.'" *Herring v. Sec'y, Dep't of Corr.*, 397 F.3d

32

1338, 1355 (11th Cir. 2005) (quoting *Agan v. Vaughn*, 119 F.3d 1538, 1549 (11th Cir. 1997)).  It is thus not reviewable here and should be dismissed.  *See, e.g.*, *Coleman v. Thompson*, 501 U.S. 722, 750 (1991); *Wainwright v. Sykes*, 433 U.S. 72, 78 (1977).

Second, this ground is almost certainly foreclosed by the Eleventh Circuit's holding in *Raulerson v. Warden*, 928 F.3d 987, 1001–04 (11th Cir. 2019).  The *Raulerson* court held that the Georgia capital sentencing statute did not violate due process by requiring the capital defendant to prove beyond a reasonable doubt his intellectual disability.  The Georgia beyond a reasonable doubt standard of proof is greater than Florida's clear and convincing standard.  Petitioner's claim cannot survive *Raulerson* and is without merit until the Eleventh Circuit or Supreme Court changes that ruling.  Just as in *Raulerson*, Petitioner here does not cite controlling federal precedent that bars this part of the Florida sentencing procedure.  Thus the Florida court's decision, even if this Court could presume it was presented to them squarely, was not "contrary to, or involved an unreasonable application of, clearly established Federal law."  28 U.S.C. § 2254(d)(1).

Third, Ground Two is to be denied because of this detailed factual record. Petitioner did not establish mental disability by clear and convincing evidence, nor could he establish it by a preponderance.  The record, especially the trial evidence, shows clearly as a matter of fact that he is not intellectually disabled.  On his

33

record, he could meet no standard of proof whatsoever, as the Florida Supreme
Court has noted correctly.  *Wright II*, 213 So. 3d at 898, 902.

Petitioner's third ground is also related to intellectual disability and the
Court turns to it now.  Petitioner asserts that his two defense lawyers provided
constitutionally ineffective assistance of counsel in the penalty phase by
improperly marshaling and presenting mitigating evidence, which mostly related to
intellectual disability.  As the petition states, Petitioner claimed that trial counsel
failed to acquire documents, failed to present mitigation witnesses, and failed to
present expert testimony about the "Flynn effect" and the practice effect on IQ
scores.  Doc. 38 at 42.  The state circuit court held an evidentiary hearing on this
claim, which it denied.  The Florida Supreme Court affirmed on this point.  *Wright
II*, 213 So. 3d at 905–08.  Thus, Ground Three is exhausted.

This ground requires consideration of the familiar precepts of *Strickland v.
Washington*, 466 U.S. 668, (1984).  This is a very familiar standard and the Court
will not repeat the boilerplate case law here.  Suffice it to say, Petitioner must
establish both that his penalty phase lawyers were deficient, and that the deficient
performance prejudiced him so as to deprive him of a reliable proceeding.  *Id.* at
687.  Both Florida courts reviewing this matter hewed closely to the constitutional
doctrines set forth in *Strickland* and federal law.  *See, e.g.*, Doc. 37 at 101–09;
*Wright II*, 213 So. 3d at 903–09.

The test is "whether the state habeas court was objectively reasonable in its *Strickland* inquiry," not an independent assessment of whether counsel's actions were reasonable. *Putnam v. Head*, 268 F.3d 1223, 1244 n.17 (11th Cir. 2001). Even so, when one reads the trial record and the penalty phase record, one is impressed by the thorough and effective lawyers who defended Petitioner with vigor and dedication.

The Florida Supreme Court reviewed in detail the efforts of Petitioner's lawyers in the sentencing phase, and we need not detail all that action here. In summary, as to the alleged failure to acquire documents, during the postconviction evidentiary hearing Petitioner's counsel presented his compete school records, from two states, which indicated Petitioner had several independent "special" education plans and was both emotionally handicapped and specific learning disabled. Two of these school reports contained psychological reports that contained early IQ. One of Petitioner's mental health experts testified he reviewed these records, and Petitioner's family members testified, corroborating these points as well. It was also established Petitioner's mother was receiving social security benefits due to his mental state. The Florida Supreme Court found that documents complained-of as missing were simply cumulative to this type of evidence. *Wright II*, 213 So. 3d at 905–08. The record bears this out. For example, school records that his present lawyers offer, *see* amended petition at Doc. 36 at 95, are

35

cumulative.  It was abundantly clear that this man suffers from mental deficits, severe learning disabilities, and was in special education classes.  His precise mental state was quite apparent and presented by the time the penalty phase concluded.

Concerning the alleged failure to properly present penalty-phase witnesses, the Florida Supreme Court noted that:

> Wright's penalty phase counsel pursued the presentation of evidence of mitigating circumstances diligently and ultimately retained five expert witnesses.  Indeed, trial counsel testified that they specifically retained Dr. Waldman and Dr. Sesta after the original experts did not find that Wright was intellectually disabled.  Furthermore, as discussed above, the record reflects that Wright's trial counsel at times believed that Wright was bright, a conclusion that was reasonable in light of Wright's input with regard to objections across the three trials and his extensive trial testimony.

*Wright II*, 213 So. 3d at 906.

These findings are record-based, and sound.  As to the claimed failure to present mitigation witnesses, Petitioner's lawyers presented additional mitigating evidence at the penalty phase, beyond that presented at the guilt phase.

The Eleventh Circuit recently addressed this type of claim in a capital case where, unlike here, additional witnesses were not presented in the penalty phase:

> No absolute duty exists to introduce mitigating or character evidence. [citation omitted]  And we have held, in a capital case, that counsel's performance was not deficient when he chose to rely on the mitigating evidence presented in the guilt phase instead of presenting additional evidence during the penalty phase. [citation omitted]  We explained that "[w]hich witnesses, if any, to call, and when to call them, is the epitome

> of a strategic decision, and it is one that we will seldom, if ever, second
> guess."

*Raulerson*, 928 F.3d at 998 (quoting *Waters v. Thomas*, 46 F.3d 1506, 1512 (11th

Cir. 1995) (en banc)).

Concerning failure to present penalty phase evidence about various mental

deficits, at the initial penalty phase the defense presented mitigation evidence of

Petitioner's unfortunate, traumatic childhood which included abandonment and

neglect.  One of Petitioner's experts testified about Petitioner's in utero exposure to

alcohol and cocaine, which caused microencephaly, a smaller brain and cranium.

He also suffered mild traumatic injuries as a child which the trial court heard

about.  *Wright I*, 19 So. 3d at 289.  The sentencing judge received the defense's

expert testimonial evidence concerning fetal alcohol syndrome and

microencephaly during the penalty phase.  *Wright II*, 213 So. 3d at 906; Doc. 36 at

89 n.15; Doc. 37 at 107.

Likewise, Petitioner's present argument that counsel were *Strickland*-

ineffective due to failure to argue the "Flynn effect" is unavailing.  This effect

describes an apparently upward drift in IQ scores in this country over the years.

*See* Doc. 36 at 100.  Petitioner contends that means his IQ scores are actually lower

on the older standard that what he registered.  A key problem with this argument is

that he took IQ tests quite a long time ago, starting at age 9.  They have remained

fairly consistent, and almost always they land him in the area *above* 70.  For this

37

same reason, Petitioner's arguments about the "practice effect,"—that scores go up when you take more tests—fails. *Id.* As the petition notes, "Wright received a full-scale 76 on this first test [in 1991]." *Id.* at 102.

As to the "Flynn effect," there is no medical/legal consensus. *See Raulerson*, 928 F.3d at 1008 ("No adjustment for the Flynn effect is required in this Circuit."); *Thomas v. Allen*, 607 F.3d 749, 757–58 (11th Cir. 2010). Here, the facts do not fit well to establish such an effect anyway. The courts below were all quite aware that Petitioner was profoundly impaired, had fetal alcohol syndrome, and a low IQ. *Wright II*, 213 So. 3d at 906–07. Under no fair reading of this record can Petitioner's trial counsel be described as incompetent to the point of "not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687, 690. And no matter how the Flynn effect might be deemed in the future, there is voluminous evidence in this case concerning Petitioner's mind, and the Florida courts reviewed it in a not unreasonable manner, consistent with controlling federal law.

The postconviction court took testimony about the Flynn and practice effects and found no prejudice. The postconviction trial court held:

> This Court does not find that [trial] counsel was deficient in not presenting experts to argue the Flynn Effect and Practice Effect. As mentioned above, the Defendant scored above 70 on all the IQ tests he took, and when the scores were adjusted by [defense expert] Dr. Kasper, the Defendant only scored below 70 on one of the adjusted test scores. The Court does not find that the Trial Court would have come

38

to any different conclusion with regard to weighing the mitigation and aggravation of it had been presented with information about the Flynn Effect and Practice Effect."

Doc. 37 at 106–07.

The finding was affirmed by the *Wright II* court, which held that:

[T]he expert testimony indicated that Wright's first IQ score was his most accurate and that all of his subsequent IQ scores fell in the range derived from his first IQ score after adjusting for the SEM, notwithstanding any practice effect or Flynn effect concerns. Furthermore, there was testimony that Wright's IQ examinations were far enough apart in time that they would not have been affected by the practice effect.

*Wright II*, 213 So. 3d at 906.

To sum up the discussion of Petitioner's mental state which is set forth in various arguments in Grounds One, Two and Three, about the best that can be said for his case was found in 2009 by the *Wright I* court.  There the Florida Supreme Court noted: "Thus, although we recognize that certain evidence may indicate some inability for Wright to premeditate daily activities, we conclude that the mental health evidence does not eradicate the evidence that he committed these murders in a cold, calculated, and premeditated manner."  *Wright I*, 19 So. 3d at 277.

This record contains the testimony of at least seven mental health experts who opined on Petitioner's mental state.[14]  The Florida courts quite properly found, and reasonably relied upon, the extensive evidence showing no ID, and the courts did so in a manner true to the controlling U.S. Supreme Court standards.

## PETITIONER'S GROUND FOUR

Ground Four states that trial counsel rendered ineffective assistance in the penalty phase by failing adequately to challenge evidence offered in aggravation.[15]  While incarcerated pending the instant trial, Petitioner was involved in two very violent jailhouse aggravated batteries, for which he was convicted separately.  The State presented these in aggravation at the penalty phase.  The first battery involved inmate Cassada who testified that Petitioner and others beat him nearly to death, which placed him in a coma for 30 days.  A37–A38 at 159–162.  Petitioner and one other inmate were convicted of the Cassada aggravated battery.  The second involved a very violent battery upon jail deputy Connelly committed by Petitioner alone, for which he was convicted.  Evidence was that Petitioner struck

---

[14] Dr. Mary Kasper testified in both the 2012 and 2015 ID hearings.  Drs. Michael Kindeln and Michael Gamache testified at the 2015 hearing.  Drs. Joel Fried, Alan Waldman, William Kremper, and Joseph Sesta testified in the 2005 penalty phase hearings.  *See* Doc. 36 at 10–11.

[15] To quote the petition: "Ground Four: Trial counsel provided prejudicial ineffective assistance during the penalty phase of Wright's capital trial when they failed to challenge evidence argued in aggravation.  The state court's resolution of Wright's claim was an unreasonable application of clearly established federal law, including *Strickland v. Washington*, 366 U.S. 668 (1984) and *Wiggins v. Smith*, 539 U.S. 510 (2003).  Further, in many respects, the state court made an unreasonable determination of facts in light of the state court record."  Doc. 36 at 123.

Connelly, knocking him unconscious, and then struck him repeatedly thereafter. Connelly was hospitalized, and went on light duty work and then retired, still receiving mental health counseling in his retirement due to the incident. A37 at 141–48.

At the postconviction phase, Petitioner argued that his lawyers were ineffective in not mitigating this evidence, primary by calling two inmates as witnesses. These inmates would have testified that Petitioner was only one of many in the Cassada attack, and that officer Connelly taunted and provoked Petitioner prior to the attack. The state circuit court granted Petitioner a hearing on these arguments, and found no *Strickland* violation. B16 at 2760–63.

At this postconviction hearing, two inmates testified that Connelly verbally harassed Petitioner. One inmate testified Connelly started the assault by throwing the first punch. B10 at 1692–96; B11 at 1813–28.

Petitioner's trial counsel (handling both the jail battery cases and the instant case) testified he was aware of the information concerning Connelly allegedly provoking the assault, but that Connelly's alleged provocation did not "justify a guard being beat half to death," and the two inmates were poor witnesses in the jail battery trials. According to the lawyer, their "minimal mitigation" did not amount "to a hill of beans." B13 at 2147–48, 2171. The trial lawyer had cross-examined Connelly intently during the aggravated battery trial, and "that had already been

41

explored" and it was not successful in front of a jury.  Doc. 37 at 64–65; B13 at

2144.  Before the court at the murder penalty phase, in contrast, the trial counsel

said that "I see very little profit in doing so unless the provocation were very

extreme.  And, as I recall, it was not and certainly not—it wasn't physical

provocation . . . . It was more taunting and, you know, playing games with people."

Doc. 37 at 65; B13 at 2145.  In the penalty phase, these facts were "not of the

degree that I think is mitigating." B13 at 2147.

The Florida Supreme Court affirmed this ruling.  *Wright II*, 213 So. 3d at

908–09, finding in part:

> This claim is meritless.  Competent, substantial evidence supports
> the postconviction court's findings.
>
> First, Wright has failed to establish prejudice.  None of the evidence
> presented during the postconviction evidentiary hearing negates the fact
> that Wright had previous convictions for battery.  Furthermore, even if
> those prior convictions were omitted, the trial court still considered
> Wright's contemporaneous convictions for first-degree murder of the
> other victim, carjacking, kidnapping, and robbery with a firearm in
> finding the prior violent felony conviction aggravating circumstance.
> As the postconviction court noted, the contemporaneous convictions
> were arguably more serious than the convictions Wright claims were
> not properly rebutted. . . . [T]wo of the three aggravating circumstances
> found below are among the weightiest aggravating circumstances. [cite
> omitted]  In addition, the previously undiscovered evidence concerning
> the attack on Cassada would have been merely cumulative to the
> concessions elicited from Cassada during penalty phase cross-
> examination and the evidence presented by Wright's trial counsel.
> Specifically, evidence was introduced that one other person was
> convicted in connection with the attack on Cassada, and Cassada
> conceded that perhaps five individuals attacked him and he did not
> know whether Wright actually struck him. . . .

Moreover, the record reflects that Wright's trial counsel made a tactical decision to not present the testimony of other inmates concerning Connelly's alleged provocation of Wright. Wright's trial counsel testified that he did not consider the provocation sufficient justification for Wright to attack Connelly, and even if it were, presentation of such evidence would not have changed the fact that Wright was convicted for the attack. Furthermore, Wright's trial counsel represented Wright in the case concerning his attack on Connelly and presented those witnesses in that case. Thus, Wright's penalty phase counsel were well aware of the inmates' testimony when they elected to not present the inmates as penalty phase witnesses. In addition, Wright's lead penalty phase counsel testified that he did not consider the inmate witnesses to be good witnesses. The decision to not present rebuttal witnesses concerning the prior conviction for attacking Connelly was a reasonable tactical decision. Therefore, the postconviction court's findings that Wright's counsel were not ineffective for failing to present additional witnesses concerning Wright's prior battery convictions are supported by competent, substantial evidence.

*Wright II*, 213 So. 3d at 908–09. This sound finding is not an unreasonable application of clearly established federal law. "A petitioner cannot establish that the outcome of the proceeding would have been different when '[t]he new evidence largely duplicated the mitigation evidence at trial.'" *Raulerson*, 928 F.3d at 999 (citing *Cullen v. Pinholster*, 563 U.S. 170, 200 (2011)).

## PETITIONER'S GROUNDS FIVE AND SIX

Grounds Five and Six contend that Petitioner suffered ineffective assistance of trial counsel by his lawyers' failure to impeach two jailhouse informant-witnesses during trial, Wesley Durant and Byron Robinson.[16]

Concerning Ground Five, witness Durant was an inmate barber at the jail. He testified Petitioner confessed to the murders during a haircut. A26 at 3721–25. Durant testified that jail guard Faulkner overheard this confession, told Durant he needed to contact detectives, and Faulkner "got the ball rolling" with the homicide detective. A26 at 3728–29. On cross examination, Petitioner's trial counsel elicited that Durant had ten felonies including two crimen falsi, had two pending serious charges, was seeking "help" on his charges; refused to give a taped statement until he got a deal, and denied seeing news reports about the case. Trial counsel then elicited that Durant earlier admitted to seeing news reports, and

---

[16] To quote the petition: "Ground Five: Wright received prejudicially ineffective assistance of counsel when trial counsel failed to impeach state witness Wesley Durant. The state court's resolution of Wright's claim was an unreasonable application of clearly established federal law, including *Strickland v. Washington*, 366 U.S. 668 (1984). Further, in many respects, the state court made an unreasonable determination of facts in light of the state court record." Doc. 36 at 130.

Ground Six states: "Wright received prejudicial ineffective assistance of counsel when trial counsel failed to impeach a jailhouse informant who indicated that he was going to commit perjury. The state court's resolution of Wright's claim was an unreasonable application of clearly established federal law, including *Strickland v. Washington,* 366 U.S. 668 (1984). Further, in many respects, the state court made an unreasonable determination of facts in light of the state court record." Doc. 36 at 136.

further that Durant was mistaken about Petitioner's hair style and his knowledge of the codefendants.  A26 at 3735–59.

At the postconviction hearing, jail guard Faulkner testified he had overheard no haircut confession or other confession by Petitioner.  B10 at 1717–19. Petitioner's trial counsel testified at the hearing and understood at the time "that the officer was present and apparently the conversation was reported to him, but he did not actually hear any admissions made by . . . the defendant.  That was my understanding.  Where that came from, I'm not sure."  B13 at 2155.  Trial counsel testified that in calling any other witness beyond the defendant, he always weighed "losing the sandwich."  That means in Florida parlance losing both opening and rebuttal closings (i.e. closing both first and last) which former Florida procedure entitled a defendant to do if he called no witnesses beyond himself in his case. B13 at 2175.

Also at the postconviction hearing Durant's nephew, an inmate, testified. He stated that Durant is untrustworthy and a known "snitch."  B10 at 1747–48. The nephew spoke with defense lawyers prior to trial but was never called.  B10 at 1749–50.

Similarly, Ground Six asserts ineffective assistance due to failure to properly impeach witness Robinson.  Robinson testified that he was a cell mate of

Petitioner, and Petitioner confessed to the murders.  A28 at 4201.  Towards the end of the trial, defense counsel informed the court they had recently spoken to several jail inmates, who claimed to have information about Robinson and another state witness.  A30 at 4502–03.  After Petitioner testified in his defense, defense counsel asked for a court colloquy in which it was discussed with Petitioner whether to call these impeachment witnesses, and it was noted on the record "that he does not wish to present any further witnesses, thus, preserving first and last closing[.]"  A30 at 4640–43.

At the postconviction hearing four inmates testified.  Doc. 36 at 137.  One testified that Robinson stated an intent to "jump into somebody's case" to help himself.  *Id.* at 138.  Another testified Robinson was a known "snitch" and he heard Robinson say he was going to jump into Petitioner's case and lie.  This witness informed Petitioner about the Robinson statements prior to trial.  Two others testified similarly.  B11 at 1802–06.  Trial counsel at the postconviction hearing testified he had no recollection of his tactical reasons for not calling these inmate witnesses, but did recall some of the inmates were facing very serious charges and would not talk to the defense, and their testimony was of limited value.  B13 at 2148–51.

The postconviction court found Petitioner failed to establish either deficiency or prejudice under *Strickland* concerning these witnesses.  Doc. 37 at 92–97.  The Florida Supreme Court affirmed, stating:

Competent, substantial evidence supports the postconviction court's findings that Wright has not established deficiency with regard to the decision to not present witnesses to impeach the credibility of Durant or Robinson.  Rather, the record reflects that the decision was the product of reasonable trial strategy.  For instance, trial counsel testified that he felt "Durant was such an easy target and so incredible" that he was not going to look for any witnesses to impeach him.  The record further reflects that trial counsel extensively and successfully cross-examined Durant with the goal of discounting his credibility.  In addition, trial counsel testified that they rejected the presentation of additional witnesses, with Wright's approval, to preserve opening and closing remarks.  Moreover, trial counsel testified that he did not consider inmates to be strong witnesses and the he did not consider their testimony sufficient to justify sacrificing the retention of opening and closing remarks.

Wright also did not suffer prejudice.  As an initial matter, Wright testified that he never confessed to either Durant or Robinson.  Therefore, any testimony concerning the credibility of Durant or Robinson with regard to Wright's alleged confession would have been merely cumulative to Wright's testimony.  Wright's attorneys extensively cross-examined each of them and even if their testimony was completely discredited, there were still other non-prisoner witnesses who testified that Wright confessed to them.  Furthermore, this Court has previously concluded that prejudice was not established for failure to object to improper guilt phase prosecutorial comments when the evidence of guilt was strong. [citation omitted]  Here, the remaining evidence of guilt was strong because, among other evidence, Wright's fingerprints were found on the car, he possessed the murder weapon, and blood attributed to one of the victims was found on a shoe attributed to Wright.  Thus, this claim fails.

*Wright II*, 213 So. 3d at 909–10.  This conclusion is based in controlling federal law, is based in a fair review of the entire record, and is reasonable given the deference due to trial counsel.

Review of these trial lawyers' strategic decisions is done in a "highly deferential" manner, applying "a strong presumption . . . of reasonable professional assistance."  *Johnson v. Sec'y, Dep't of Corr.*, 643 F.3d 907, 928 (11th Cir. 2011), (quoting *Strickland*, 466 U.S. at 689).  Experienced trial lawyers know that "considering the realities of the courtroom, more is not always better."  *Raulerson*, 928 F.3d at 998, (quoting *Chandler v. United States*, 218 F.3d 1305, 1319 (11th Cir. 2000) (en banc)).  Accordingly, Petitioner is not entitled to relief on Grounds Five and Six.

## PETITIONER'S GROUND SEVEN

Petitioner's Seventh Ground claims that trial counsel was constitutionally ineffective in failing to object to the prosecutor's closing argument regarding Petitioner's character or propensity to commit violence.[17]  The reader will recall the factual setting of the instant case: A weekend crime spree where Petitioner burgled a house and did a drive-by shooting of local rival Carlos Coney with the

---

[17] Ground Seven states: "Defense counsel's failure to object to the improper argument regarding Wright's propensity to commit violence constituted ineffective assistance of counsel.  The state court's resolution of Wright's claim was an unreasonable application of clearly established federal law, including *Strickland v. Washington*, 366 U.S. 668 (1984).  Further, in many respects, the state court made an unreasonable determination of facts in light of the state court record."  Doc. 36 at 141.

stolen pistol, then kidnapped and shot the victims with the pistol, ditching their car and needing a ride which caused him to engage in a third shooting to carjack a ride home.  Thus the admitted res gestae involved three disparate shootings in a short period of time, all which tied Petitioner to the main murder weapon.

Petitioner contends that the prosecutor's closing argument, which was not objected to due to *Strickland*-level ineffectiveness, crossed the line from evidence summation to an argument that Petitioner had a propensity or character for violence.  The prosecutor referred to Petitioner as a 'hoodlum," "murderer," "cold-blooded," and a "criminal."  A31 at 4819, 4820, 4823, 4835; A32 at 4839, 4851.  Concerning Petitioner's testimony about self defense in the drive-by shooting of the rival, the prosecutor argued, "Well, that's crap.  It doesn't make any sense.  He stole the gun on Thursday.  He used the gun on Friday.  He shot a man with it.  He certainly doesn't have any problems shooting people.  He shot Carlos Coney."  A31 at 4822–23.  The Petitioner also complains about other "propensity arguments" which are set forth below.[18]

---

[18] The prosecutor argued concerning Petitioner's self-defense testimony:  "When you have a carjacking and murder like this that's senseless, it's an irrational act, and you cannot for the life of you understand why that happened.  You'll never understand why T.J Wright chose to shoot Carlos Coney or chose to shoot [the two murder victims].  It's—it's an irrational thing to do."  A31 at 3824.  "Carlos Coney and Bennie Joiner both know the guy.  He shoots them, a man that he knows.  The man—the police come, he goes, 'Yeah, who shot you?'  'T.J. Wright shot me.'  Okay, It wasn't a mystery.  So how's he going to refute that?  Say he didn't shoot him?  So he does the next best thing.  Well, I thought maybe [Coney] was going for something.  You know, you can't believe T.J.  This guy wants you to believe that somebody that he has an acrimonious relationship with, they don't get along, he's driving by, sees the guy, has a gun in his car, and

49

The prosecutor's closing was not objected to.  Petitioner raised this objection first in his direct appeal.  The Florida Supreme Court addressed the matter in the broader context of extrinsic evidence/collateral crimes.  *Wright I*, 19 So. 3d at 295.  Concerning the prosecutor's closing, the *Wright I* court addressed Florida state law evidentiary standards.  It stated, "Multiple statements that Wright 'certain[ly] doesn't have any problems shooting people' lean toward an impermissible propensity-toward-violence argument."  *Id.*  "[W]hen [the State] cast Wright as a violent character who acts upon his desire to shoot people, the State abused [favorable rulings] by inappropriately taking it beyond the edge of propriety in contradiction of the evidence doctrine of Florida."  *Id.*  The Florida Supreme Court concluded that the comments were harmless error because no contemporaneous objection was lodged, and the similarities between the related crimes did not become a feature of the trial.  *Id.*  It concluded the unpreserved comments did not rise to fundamental error.  *Id.*

Petitioner asserted in his state postconviction motion that failure to object to these prosecutorial statements in the guilt phase closing arguments was ineffective

---

tells his buddy turn around and go back, I want to talk to him.  Bull crap.  He wanted to shoot him.  That's why he told [the driver] turn around.  That's exactly what he did.  He shot him."  A31 at 4827–28.

   Later, when summing evidence related to the Winter Haven/Mendoza carjacking, the prosecutor stated: "But the second time, when you look at this map, after he dumped [the victims'] car on Bolender Road and went and carjacked the Mexicans, he comes up to right there, and that's when he flees.  That's where he shoots at Mr. Mendoza and the owner of the car who's since died in a car accident.  That's where he shoots at him."  A31 at 4829.

assistance of counsel under *Strickland*.  Petitioner received a hearing on the merits of this argument.  Trial counsel testified that, as a general rule, he was reluctant to object to the prosecutor's closing argument lest the same objections be visited upon him.  He also did not tactically think it was wise to let the jury think that he is being obstructive, and "trying to pull the wool over their eyes."  B13 at 2166. After reviewing the transcripts, trial counsel stated in hindsight, he should have objected to the comments.  B13 at 2166–67.  In denying the claim, the postconviction court noted the state's evidence included Petitioner's admissions describing his involvement, evidence that clearly tied the Petitioner to the murder weapon, his fingerprints were on the victim's car, and the victim's blood was on his shoes: "The Court finds no reasonable probability that, but for counsel's deficiency with regard to the un-objected to comments of the prosecutor that the result of the proceeding would have been different."  B16 at 2748.  After reviewing the record on this point, the Florida Supreme Court found no prejudice.  *Wright II*, 213 So. 3d at 911.

This state court holding is not contrary to or an unreasonable application of clearly established federal law.  Given the crime spree that was proven here (and no claim is now made that collateral evidence or extrinsic evidence is grounds for relief), the closing argument comments were factual, accurate, and a fair summary of what the jury had heard.  There is no basis for relief in this seventh ground.

51

## PETITIONER'S EIGHTH AND NINTH GROUNDS

In Ground Eight, Petitioner contends his death sentence is unconstitutional under *Hurst v. Florida*, 136 S. Ct. 616 (2016)[19] and in his ninth ground,[20] Petitioner claims the Florida death penalty is unconstitutional under *Ring v. Arizona*, 536 U.S. 584 (2002).  In a nutshell, *Hurst* and *Ring* require every fact supporting a death penalty, i.e. aggravators, etc., to be determined and found by a jury as fact-finder, not a jury sitting as an advisory jury.  In other words, all predicates and facts to support the death penalty require a jury finding.  *See Hurst*, 136 S. Ct. at 621–22.  *Hurst*, which came after *Ring* and after Petitioner's sentencing, invalidated part of the Florida death penalty statute and required a full jury finding on every contested factual element of the death penalty.

But *Hurst* is entirely inapt here because Petitioner elected a strategy to forego the jury finding at the penalty phase, believing his best chances were with the bench.  Here Petitioner clearly and at length, waived his right to proceed with a

---

[19] This ground states: "Ground Eight: Wright's death sentence is unconstitutional under *Hurst v. Florida*.  The state court's resolution of Wright's claim was an unreasonable application of clearly established federal law, including *Hurst v. Florida*, 136 S. Ct. 616 (2016), *Ring v. Arizona*, 536 U.S. 584 (2002), and *Apprendi v. New Jersey*, 530 U.S. 466 (2000).  Further, in many respects, the state court made an unreasonable determination of facts in light of the state court record."  Doc. 36 at 144.

[20] "Ground Nine: The trial court erred in denying Wright's motions that the Florida's death sentencing statutes are unconstitutional under the fifth, sixth, and fourteenth amendments of the United States constitution as shown in *Ring v. Arizona*.  The state court's resolution of Wright's claim was an unreasonable application of clearly established federal law, including *Ring v. Arizona*, 536 U.S. 584 (2002) and *Apprendi v. New Jersey*, 530 U.S. 466 (2000).  Further, in many respects, the state court made an unreasonable determination of facts in light of the state court record."  Doc. 36 at 152.

jury at penalty phase.  He gave up his right to jury findings at the penalty stage.

Instead, he opted for strategic reasons to have the judge make findings in the

penalty phase.  In effect he opted for a bench trial on that subject.  The Florida

Supreme Court quite properly found "Wright knowingly, intelligently, and

voluntarily waived his right to a penalty-phase jury . . . . Wright concedes that he

waived his right to a penalty-phase jury, thus barring this claim." *Wright I*, 19 So.

3d at 297.  Thus *Hurst* and *Ring* afford Petitioner nothing.

One cannot fault Petitioner for opting against jury consideration at the

penalty phase.  He testified at length and the jury by its verdict chose to disbelieve

every material thing he said.  Further, the jury had already found the existence of

two death phase aggravators.  By its verdicts of armed kidnapping with a firearm

and robbery with a firearm the jury had already established two aggravating

circumstances: 1) a previous conviction of another capital felony or one involving

the use or threat of violence to a person, and 2) commission of the murder for

pecuniary gain.

Petitioner's main argument appears to suggest his jury trial waiver at the

penalty phase was improper and not knowing, due to ID that became apparent only

after the penalty phase was well underway.  *See* Doc. 36 at 146–50.  Although

contrary to the record as a whole, this argument cites mostly the postconviction

testimony of Petitioner's defense lawyers.  But during this extensive factual waiver

at the time of the penalty phase the defense lawyer stated that Petitioner was lucid, and did understand, and did give a knowing waiver of the jury at penalty phase. *See* A33 at 5092 ("[Petitioner] appears and has appeared for the last several days to be articulate, bright, [and] aware of what's going on in his reasoning.").  Both defense lawyers and the defense investigator stated to the court that they had seen nothing "which would indicate this to be other than a knowing, intelligent, and voluntary waiver at this point[.]"  *Id.* at 5093–94.  And Petitioner's reasons for asking the jury to be discharged before the penalty phase were rational: Petitioner told his lawyer "[h]e felt they didn't like him, that they were going to recommend a death penalty, that they had already made up their minds, they weren't going to be fair, and he wanted to waive his right to a jury recommendation."  Doc. 37 at 63.

Because Petitioner waived his right to a jury during the penalty phase, *Hurst* and *Ring* do not provide Petitioner grounds for relief.  The state courts' holdings on this matter are not contrary to or an unreasonable application of clearly established federal law.  There is no basis for relief on Grounds Eight and Nine.

## PETITIONER'S TENTH GROUND

In his final ground Petitioner asserts cumulative error deprived him of a fair trial, especially in light of the ineffective assistance of counsel he received.[21]

---

[21] "Ground Ten: Cumulative error deprived Wright of the fundamentally fair trial guaranteed under the sixth, eighth, and fourteenth amendments.  The state court's resolution of Wright's claim was an unreasonable application of clearly established federal law, including *Strickland v.*

Although this ground does appear to be exhausted, it contains no content in the amended petition, nor substantive content in the memorandum, beyond matters already considered and found to be wanting.  Doc. 36 at 154–56; Doc. 38 at 73–75. In his memorandum, Petitioner argues that the Florida Supreme Court, in reviewing this ground, adopted a "nonsensical standard of proof for cumulative error claims . . . ."  Doc. 38 at 73.  The amended petition fails entirely to state which errors, insufficient in themselves but cumulatively sufficient, exist or fall under this ground.  In the undersigned's view, this non-list is not surprising. Petitioner received an energetic, detailed, and vigorous defense, handled with thoughtfulness and fairness by the Florida state courts.  There were no errors presented that could cumulate or conglomerate to create a grounds for relief under ground number ten.

The amended petition is without merit and denied.  No issue or ground presented would give reasonable jurists cause to conclude there is any basis for relief or any portion with merit.  Title 28 U.S.C. § 2253(c)(2) permits the Court to issue a certificate of appealability "only if the applicant has made a substantial showing of the denial of a constitutional right."  That showing has not been made here.  *See generally Slack v. McDaniel*, 529 U.S. 473, 478 (2000); *Eagle v.*

---

*Washington*, 366 U.S. 668 (1984).  Further, in many respects, the state court made an unreasonable determination of facts in light of the state court record."  Doc. 36 at 154.

*Linahan*, 279 F.3d 926, 935 (11th Cir. 2001).  Therefore, the undersigned denies a certificate of appealability, and denies a request to proceed on appeal *in forma pauperis*.  Petitioner must obtain permission from the court of appeals to proceed *in forma pauperis*.

**DONE AND ORDERED** at Tampa, Florida, on August 19, 2020.

*/s/ William F. Jung*

**WILLIAM F. JUNG**
**UNITED STATES DISTRICT JUDGE**

**COPIES FURNISHED TO**:
Counsel of Record

56